Frank A. HUDSON, Plaintiff-Appellant,

v.

Herbert MARSHALL et al.,
Defendants-Respondents.

No. 9959.

Missouri Court of Appeals,
Springfield District.

March 4, 1977.

Motion for Rehearing or Transfer Denied
on March 28, 1977.

Application to Transfer Denied
May 10, 1977.

Charles A. Werner, St. Louis, for plaintiff-appellant.

L. D. Joslyn, Philip R. Pruett, Jeffrey C. Vaughan, Joslyn, Joslyn & Vaughan, Charleston, for defendants-respondents.

FLANIGAN, Judge.

This non-jury action was instituted by Frank A. Hudson against defendants, who are members of the Board of Education of Charleston R–I School District. Plaintiff, a former employee of the school district, sought reinstatement to his former position, back pay, and other damages. The petition was in two counts. Count I was based upon violations of certain rights allegedly held by plaintiff as a "permanent teacher" holding an "indefinite contract" under the provisions of the Teacher Tenure Act. (§§ 168.-102 to 168.130 V.A.M.S.)[1] Count II was based upon alleged violations of plaintiff's rights under the federal and state constitutions. The trial court denied plaintiff relief on both counts and plaintiff appeals. This court affirms.

Plaintiff's employment by the board commenced on March 1, 1966, and ended in August 1972.[2] His initial contract was for

1. All statutory references, unless otherwise stated, are to RSMo 1969 V.A.M.S.

2. The transcript does not show why plaintiff's employment continued until August 1972. The

a period of four months commencing March 1, 1966. Thereafter he received annual contracts commencing on July 1 of each year. His first annual contract commenced July 1, 1966. Except for the periods, the years involved, and the salary amounts, his contracts for his original four-month period and for the school years 1967–68, 1968–69, and 1969–70 were substantially in the same form. That form bore the caption "Teacher's Contract." It referred to Hudson as "a legally qualified public school teacher." It stated that Hudson "agrees to teach the public school of said district for the term of twelve months."

The contract for the school year 1970–71 was entitled "Teacher's Employment Contract." It referred to Hudson as "the teacher." It provided that "the teacher agrees to teach in the public schools of said district" for the school year. It included this provision: *"As a condition to employment by the Board, the Teacher agrees to obtain prior to the first day of service hereunder and to have at all times during the term of this contract a valid certificate of license to teach in the public schools of the State of Missouri."* Plaintiff's final contract, that for the school year 1971–72, was in the same form except for the year involved and the amount of compensation.

Although plaintiff's earlier contracts did not contain an express provision that certification was a condition of his employment, Superintendent Wells, a witness for the defense, testified on direct examination that plaintiff was required to have a license.

As plaintiff's excellent brief points out, the validity of Count I hinges upon the issue of whether plaintiff was a "permanent teacher" within the meaning of § 168.-104(4) V.A.M.S.

Those portions of § 168.104 which are germane to this action include the following:

petition alleged that plaintiff's employment ended on June 30, 1972.

**3.** Charleston R–I School District is not a "metropolitan school district."

*'168.104 Definitions.*

The following words and phrases when used in sections 168.102 to 168.130, except in those instances where the context indicates otherwise, mean:

. . . . .

(3) '*Indefinite contract*', every contract heretofore or hereafter entered into between a school district and a permanent teacher;

(4) '*Permanent teacher*', any teacher who has been employed or who is hereafter employed as a teacher in the same school district for five successive years and who has continued or who thereafter continues to be employed as a full-time teacher by the school district. . . .

(7) '*Teacher*', any employee of a school district, except a metropolitan school district,[3] regularly required to be certified under laws relating to the certification of teachers, except superintendents, assistant superintendents, and any other persons regularly performing supervisory functions as their primary duty."

Count I of the petition alleged, in essence: plaintiff was employed by the board from February 15, 1966, until June 30, 1972; the written contracts previously referred to had been executed; "plaintiff's duties under said teacher's contracts was (sic) coordinator of federal programs for the Charleston R–I School District"; under the terms of the contracts plaintiff was required to have "a valid license to teach in the public schools for the State of Missouri" and he was at all times so licensed; at all times after February 15, 1971, plaintiff was a "permanent teacher" within the definition of § 168.104(4) and "as a permanent teacher an indefinite contract existed between plaintiff and defendants under RSMo 168.-104(3) and 168.106"; the termination of his contract by defendants was not done in accordance with § 168.116.[4]

**4.** § 168.116, in general, requires service upon the teacher of a written statement of the grounds for termination, entitling the permanent teacher to request a hearing thereon.

In order to support the cause of action contained in Count I, it was incumbent upon plaintiff to prove the existence of an "indefinite contract." This required proof that plaintiff was a "permanent teacher." Proof that he was a "permanent teacher" necessitated proof that he was a "teacher."

Thus the initial inquiry is, was plaintiff an "employee of a school district . . . regularly required to be certified under laws relating to the certification of teachers"?

Plaintiff, who was 60 years old at the time of trial, obtained a Bachelor of Arts Degree from Southwest Missouri College in 1937. In 1949 he received a Master's Degree from George Peabody College for Teachers, Nashville, Tennessee. Thereafter, he took graduate courses at three universities. He has had a Missouri public school teacher's certificate continuously since 1937 and at least since September, 1969, it has been a lifetime certificate. His certificate authorizes him to teach in the positions of "elementary grades," social studies (secondary schools), elementary principal, and secondary principal. During his period of employment by the board his certificate was on file with the clerk of the district.

Prior to 1966, plaintiff was employed in other Missouri and out-state school districts in various capacities, including sixth grade school teacher, elementary principal and high school principal. On February 24, 1966, the Charleston Board adopted a motion that "Frank Hudson be contracted at a salary of $9,500 as Curriculum Supervisor for federal programs." Minutes of board meetings held in subsequent years listed Hudson among "the following administrators" to whom annual contracts were to be offered.

It was plaintiff's testimony that at no time during his employment by the Charleston Board did he have the title of superintendent, assistant superintendent, elementary principal, or secondary principal. He was initially hired by the board "to make a survey in the curriculum area." In July 1966, when Thomas Wells became superintendent, Wells assigned plaintiff, under the authority of the board, "to become familiar with the various federal education programs under the Civil Rights Act of 1964, and to prepare proposals for the school district under Title I through Title VI of the Civil Rights Act." The trial court found that throughout his employment plaintiff's activities were confined to those duties.

Plaintiff's duties included discussing the various programs with Superintendent Wells, filling out forms for the programs, submitting them to Wells for corrections, and thereafter submitting them to governmental authorities. Plaintiff's work also included the preparation of the budget for "these various federal programs." The budget included salaries for teachers and administrators. Plaintiff's salary was included in the salaries for administrators.

Unlike classroom teachers, plaintiff did not fill out absentee reports when he was absent from his work on occasion. It was his testimony that in his position he could and did "leave the campus pretty well whenever I wanted to during the school day." Although the evidence showed that all teachers were placed on a salary schedule, there was no relationship between plaintiff's salary and the teachers' salary schedule. Like classroom teachers, however, plaintiff received a monthly salary check from the school district and from that check a deduction was made for hospital insurance "arranged by the Missouri State Teachers Association." Another deduction from plaintiff's check was for "Missouri State Teachers Retirement" to which the state made matching contributions.

Among the exhibits introduced were copies of letters which plaintiff had written to government officials in which plaintiff described his own position as "Administrator

---

§ 168.114 sets forth six causes "except for one or more" of which an indefinite contract with a permanent teacher shall not be terminated. § 168.118 sets forth the procedure for the termination hearing. § 168.120 gives "the teacher" the right to appeal from the decision of the board.

and Supervisor, Title I Projects, PL 89–10." Plaintiff, however, minimized the degree of his contact with other employees of the school system, including teachers. Although one governmental form recited that plaintiff's duties included "day to day supervision of Title I staff," it was plaintiff's testimony that "I did not do that." He said he did not do any supervision of the Title I staff, day to day or otherwise.

Plaintiff was not assigned to a classroom and did not, at least in the usual sense, teach or have contact with students.[5] It was plaintiff's testimony that he did not hire, terminate, transfer, assign, evaluate, promote, discipline, or reward any teachers, nor was he responsible for their work. Plaintiff's office was located in the central office building which also contained the offices of the superintendent, the assistant superintendent, the meeting room of the board, and two stenographers. Plaintiff did no supervision of the classroom teachers, that supervision being done by the principal.

On April 13, 1972, plaintiff appeared before the board to present some of his "proposals." After plaintiff left the meeting, the board voted "that Frank Hudson not be rehired for the 1972–73 school year." On April 14, 1972, Superintendent Wells gave written notice to the plaintiff that he had not been rehired. The board gave plaintiff no reasons for his not being reemployed. The termination procedures prescribed by § 168.116 were not carried out. Terry Rowe, a classroom teacher in the system, was "reassigned as coordinator of special programs" and assumed the duties formerly performed by plaintiff.

Evidence offered by defendants showed that the same contract forms which contained plaintiff's agreements were used in the hiring of all other "certified personnel" "whether they were a teacher or administrator or whatever."

Plaintiff devotes most of his briefs to his contention that he was not within the third category mentioned in the *exception* to the definition of "teacher" contained in § 168.-104(7). That third category consists of "any other persons regularly performing supervisory functions as their primary duty." Plaintiff's brief states that plaintiff not only did not "supervise teachers; he was told explicitly by Superintendent Wells that he was *not* to supervise teachers and there was no evidence or testimony that plaintiff supervised any teachers." Plaintiff also insists that "persons who supervise a program" are not within the excluded category. Finally, plaintiff argues, he "did not have any of the duties, tasks or responsibilities which normally constitute the term 'supervise.'"

Such assertions, advanced in support of plaintiff's argument that he was not a member of the excluded category, tend to undermine his contention that he was within the general class itself, that is the class embraced by the statutory definition of "teacher" prior to the application of the ternary exception.

 In resolving the issue of whether plaintiff was a "teacher" as defined in § 168.104(7), this court may consider "the general school laws, laws dealing with special school subjects, school laws enacted at the same time or on widely different dates, school laws once in force and later repealed, and contemporary history of those enactments." *Lemasters v. Willman*, 281 S.W.2d 580, 584[1] (Mo.App.1955). "Various provisions of a legislative act should be construed together and harmonized if possible." *Spitcaufsky v. Hatten*, 353 Mo. 94, 133, 182 S.W.2d 86, 110[64] (banc 1944). With an exception not applicable here, § 1.090 requires, in the construction of statutes, that "words and phrases shall be taken in their plain or ordinary and usual sense." When the language of a statute is

5. When asked by his counsel if he did any teaching during his employment by the school board, plaintiff replied that he did some teaching at "one workshop." Apparently this was a reference to an isolated incident where plaintiff addressed some teachers with regard to Title VI "which involved training aids."

unambiguous and conveys a plain and definite meaning, the courts "have no business foraging" among the rules of statutory construction to look for or impose another meaning. *DePoortere v. Commercial Credit Corp.*, 500 S.W.2d 724, 727[1] (Mo.App.1973).

Cases decided under Teacher Tenure Acts in other jurisdictions are of little assistance in view of differing statutory terminology.[6]

Because plaintiff was an employee of the school district, he meets the first requirement of the statutory definition of "teacher." But was plaintiff "regularly *required* to be certified under laws relating to the certification of teachers"? Plaintiff's petition alleged and his briefs emphasize that plaintiff's *contracts* "required plaintiff to have and maintain a valid certificate of license to teach in the public schools of the State of Missouri." He assumes that the *source* of the "requirement," within the meaning of the statute, may be this specific school board, through the contracts which he signed, some of which, as previously pointed out, recite that "as a condition to employment by the board, the teacher agrees" to obtain and have "a valid certificate of license to teach." This court disagrees with that assumption.

If the presence of the "requirement" element were satisfied by the fact that this specific school board imposed it, a lack of uniformity might develop throughout this state with regard to who are "teachers" within the meaning of the Act. For example, Section 168.104(5), a part of the Teacher Tenure Act, gives certain rights to "probationary teachers." It provides, in part:

" 'Probationary teacher', any teacher as herein defined who has been employed full time in the same school district for five successive years or less. . . . In the case of any probationary teacher who has been employed in any other school system as a full-time teacher for two or more years, the board of education shall waive one year of his probationary period."

Assume that School Board A has an opening for a position performable by a person not having the professional talents evidenced by a certificate. School Board A, however, makes it a condition of employment that the position be filled by a person having a certificate. Assume further that School Board B has a similar opening but does not require that the applicant have a certificate. School Board B fills the position with a person who does have a certificate. If plaintiff's argument be sound, the employee of School Board A would be a "teacher" while the employee of School Board B would not be a "teacher."

If the hypothetical employee of School Board A, having been employed two or more years, entered the employment of School Board C, School Board C, under § 168.104(5) must "waive one year of his probationary period." But if the hypothetical employee of School Board B, having been employed for two or more years, entered the employment of School Board C, no such waiver is mandated. It seems unlikely that the legislature would have intended such confusion or lack of uniformity.

Section 168.106 of the Teacher Tenure Act deals with six matters which affect the continuation of an indefinite contract. One such matter is "compulsory or optional retirement when the teacher reaches the age of retirement provided *by law, or by regulation established by the local board of education.*" This is one instance where the policy of a local board was considered by the legislature and specific provision was made therefor. When the legislature felt that retirement could be something provided by law or provided by local regulation, it specifically said so. But in the statute under scrutiny, § 168.104(7), there was no reference to such individual board policy.

If plaintiff's construction of the statute were correct, the pertinent language of the statute could easily have read "regularly required *by the local board of education* to be certified under laws relating to the certi-

---

**6.** E. g. *Nagy v. Board of Education of School Dist. No. 28J*, 31 Colo.App. 45, 500 P.2d 987 (1972), holding that a social services consult-

ant, although possessing teacher's certificate, was not entitled to tenure.

fication of teachers." Several other portions[7] of the Teacher Tenure Act which vest powers in the board or contemplate board action make specific provision therefor.

If "regularly required to be certified under laws relating to the certification of teachers" refers to a requirement imposed by a school board, and not by the law itself, could not a school board evade its responsibilities under the Teacher Tenure Act by the simple expedient of not inserting such a requirement in its teacher contracts? Or could it, as a matter of whim, insert the requirement in contracts for some teachers, those on whom it wished to confer tenure rights, and omit the requirement in the contracts given to teachers who, but for the omission, would enjoy the benefits of tenure? Could the school board, with regard to the same teacher, insert or withhold the requirement from year to year depending upon its attitude toward that person? It is not reasonable to believe that such results were within the legislative intention.

The "laws relating to the certification of teachers" include §§ 168.011[8] and 168.021.[9] Section 168.011 forbids the employment of a person to teach in any position in a public school until he has received a valid certificate entitling him to teach in that position. Neither in the trial court nor in this court has plaintiff claimed that the duties which he performed for the school district were such that they came within the command of § 168.011. Plaintiff's certificate authorized him to teach in the position of elementary grades, social studies (secondary schools), elementary principal, and secondary principal. Plaintiff has not claimed that the duties which he performed for the school district lay within any of these four classifications.

It seems clear that the language "regularly required to be certified under laws relating to the certification of teachers" is not satisfied merely because the employee is in fact certified, that is, possesses a certificate. If that were so, the language "regularly required to be" would be surplusage. Moreover, § 168.101 V.A.M.S. (enacted Laws 1973, p. 277, § 1) gives certain employment rights to "legally certificated teachers not employed as superintendent of the district *and not eligible under § 168.104 RSMo 1969, to gain permanent status or tenure in the position held within the school system.*" This clearly indicates that an employee could be a "legally certificated teacher" and still, prior to the enactment of § 168.101 in 1973, not be eligible under § 168.104 to gain permanent status or tenure in the position held.

■ This court holds that the language "any employee of a school district . . . regularly required to be certified under laws relating to the certification of teachers," as used in § 168.104(7), refers to an employee holding a position of the type mentioned in § 168.011, that is, a public school position in which the person was employed *to teach*. The *source* of the "requirement" is the law itself, the "laws relating to the certification of teachers," and not the specific school board nor the specific employment contract.

Although § 168.104 defines "teacher" it contains no definition of the word "teach." Section 168.011, quoted in footnote 8, uses

---

7. Other sections of the Teacher Tenure Act make reference to the "written consent of the school board," § 168.106(4); "termination by the board of education," § 168.106(5); "the board of education of a school district may modify . . .," § 168.110; "salary schedule adopted by the board of education," § 168.110(2); "written standards of performance . . . adopted by the school board," § 168.114.2; and "a board of education may establish policies for granting leave of absence . .," § 168.122.

8. Section 168.011 provides: "No person shall be employed to teach in any position in a public school until he has received a valid certificate of license entitling him to teach in that position."

9. Section 168.021 provides for the granting of "certificates of license to teach in the public schools of the state." In its present form (amended by Laws 1973, p. 230, § 1, effective July 1, 1974) the "certificates of license" are granted by the State Board of Education, "under rules and regulations prescribed by it" and by various colleges and universities.

the word "teach" but does not define it. Webster's Third International Dictionary defines "teach" as "to cause to know a subject . . . to direct as an instructor . . . to impart the knowledge of . . to direct, instruct or train by precept, example or experience. . . ." The same authority says that it is synonymous with "instruct, educate, train, discipline, school, coach, tutor."

If plaintiff's position were such that it could properly be said he was *teaching* in it," as § 168.011 contemplates, whom did he teach? Did he cause anyone to know a subject? Did he cause anyone to know how to do something? Whom did he direct, instruct or train? Plaintiff had no contact with the students and his contact with the teachers was, according to his testimony, most limited. He said he did no supervision of them, nor did he do any "supervision of the Title I staff." His duties, as the trial court found, were confined, at least primarily, to becoming familiar with the various federal programs and preparing proposals for the school district pursuant to the pertinent federal statutes. Such duties involved no teaching of another person.[10] In so stating this court does not intend to discount the significance of plaintiff's position. No doubt it required the patience to peruse and the capacity to comprehend the plethora of regulations which presumably underlay the federal programs. But any element of teaching involved was that of self instruction.

So far as the word "regularly" is concerned, it appears twice in § 168.104(7). Its first use is to modify the word "required" in the phrase under consideration. Its second use is in the exception dealing with "superintendents, assistant superintendents, and any other persons *regularly* performing supervisory functions as their primary duty."

■ Synonyms for the word "regularly" include "customarily," "normally," and "usually." The American Heritage Dictionary of the English Language. Webster's Third International Dictionary indicates that the word "regularly" is also synonymous with "correctly," "properly." Because the second use of the word "regularly" in the statute seems more likely to have been used in the first sense, that is, as being synonymous with "customarily," "normally," "usually," that may lend weight to the argument that its use in the first instance was with the same meaning. In its first use the word modified the word "required" rather than the word "certified." Had it modified the word "certified" it would probably be sound to equate it with the word "properly" or "correctly." Since persons employed by school boards do not always do the same work throughout their employment, that is, some of their duties may involve teaching and some may not, it may well be that the word "regularly" was inserted in the statute to include within its definition those persons who, although not *always* filling positions requiring teaching certificates under § 168.011, usually fill such positions. Thus an occasional or sporadic assignment of a teacher to non-teaching duties would not disqualify him so long as his usual and customary duties required certification.

■ This court holds that plaintiff was not "regularly required to be certified under laws relating to the certification of teachers." Accordingly he was not a "teacher" within the meaning of § 168.-104(7). The trial court properly denied him relief on Count I of the petition.

---

**10.** In *Spigelmire v. School Dist.*, 352 Pa. 504, 43 A.2d 229 (1945) the plaintiff was the holder of a permanent state teacher's certificate but was employed as a clerk. She received a contract which provided that she was "to teach in the said school district," the contract conforming to the Teacher Tenure Act in Pennsylvania. In holding that the plaintiff was not entitled to tenure, the court said at p. 231:

"Appellant would have us clothe the verb 'teach' with a meaning that it has never had in any dictionary or in any known judicial opinion. The verb 'teach' is a very old word of long established and universally known meaning. Changing the meaning of words is not a legislative function. There is nothing in the Teachers' Tenure Act which indicates that the legislature intended to make the word 'teach' and 'clerk' synonymous."

Count II of the petition, which incorporated the allegations of Count I, also alleged that plaintiff "had a legitimate expectation of continued employment, absent sufficient cause, . . . under the customs, policies and practices of the Charleston R–I School District"; that defendants "by refusing to grant plaintiff a hearing prior to or after his termination violated plaintiff's rights to due process"; that defendant's "termination of plaintiff's indefinite contract has substantially impaired plaintiff's ability to find other employment in the educational field"; and that, despite diligent efforts, plaintiff has been unable to obtain such employment.

Count II also alleged that plaintiff's employment was terminated "because he spoke against the termination of a fellow teacher." There was, however, no proof in support of this allegation nor is it mentioned in plaintiff's briefs.

In support of his assertion that the trial court erred in denying him relief on Count II, plaintiff points to the evidence concerning his professional background, his employment by the Charleston Board, the termination of that employment "without any reason or charges," and the fact that he was then 58 years old. Plaintiff then argues that his non-retention, *coupled with his age,* deprived him "of his 'liberty' by foreclosing his freedom to remain in the educational field" and deprived him of "a 'property' interest in continued education."

It should be noted that this case does not involve a "mid-term dismissal," as was the situation in *Valter v. Orchard Farm School District,* 541 S.W.2d 550 (Mo.1976) and the principles enunciated therein are inapposite. In the case at bar plaintiff was not discharged during the school year for which he had been employed. He served the full period of his employment, received full compensation therefor, and merely was not reemployed for the following year.

Plaintiff places his primary reliance upon two decisions of the Supreme Court of the United States, *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548

(1972), and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

In *Roth* the court held that procedural due process applies only to the deprivation of interests encompassed within the Fourteenth Amendment's protection of liberty and property and that the range of such interest is not infinite; that procedural due process protects only those interests that a person has already acquired in specific benefits; that Roth was not deprived of an interest in "liberty" for in declining to reemploy him, Roth being a non-tenured teacher, the state did not impose on him any stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities; that Roth was not deprived of an interest in "property" because his contract provided that his employment was to terminate at the end of the academic year, and he thus had no interest protected by the Fourteenth Amendment in reemployment for the next year; accordingly, Roth was not constitutionally entitled to a statement of reasons or to a hearing on the decision not to rehire him.

In *Sindermann* the court held that Sindermann's lack of a contractual or tenure right to reemployment, taken alone, did not defeat his claim that nonrenewal of his contract violated his constitutional rights. The court pointed out that Sindermann claimed that the college which employed him "had a de facto tenure program and that he had tenure under that program." The holding was that Sindermann should have been afforded the opportunity to prove the existence of such "de facto tenure." Such proof, said the court, would not entitle Sindermann to reinstatement but would obligate the college officials to grant a hearing at his request whereby he could be informed of the grounds of his non-retention and challenge their sufficiency.

The evidence does not support, and plaintiff's brief does not claim, that there was evidence in this case of a "de facto tenure program" of the type mentioned in *Sindermann.* Similarly lacking is any claim by plaintiff that defendants made any charge

against him that might "seriously damage his standing and associations in his community" as mentioned in *Roth*. Indeed plaintiff stresses that there were "no charges" made against him.

Although plaintiff argues that he failed to obtain other employment in his profession by reason of his age and "non-retention," there is no evidentiary support for that assertion. Plaintiff did testify that he sought employment at other educational institutions, and that the application forms required him to state why he was no longer employed by the Charleston School District, but he offered no testimony showing what "reasons" he stated in the application nor did he show that the statement of them, whatever they may have been, coupled with his age, had anything to do with his limited [11] success in obtaining other employment. There was no evidence that plaintiff had to state his age in the employment application.

■■ Plaintiff has failed to demonstrate that the failure of the board to reemploy him was occasioned by plaintiff's exercise of any of his constitutional rights. Additionally, plaintiff has failed to show that his non-retention, alone or in conjunction with his age, had any effect upon his efforts to obtain other employment in his chosen profession.

The trial court properly denied plaintiff relief on Count II of the petition.

The judgment is affirmed.

All concur.

11. Plaintiff did do some part-time substitute teaching for another school district, apparently during the 1973–74 school year.